**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ISSAM AZZIZ,

      **Plaintiff,**

v.                                     **CASE NO. 8:11-CV-01773-RAL-AEP**

PRICEWATERHOUSECOOPERS LLP,

      **Defendant.**

_____/

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

Defendant PricewaterhouseCoopers LLP ("PwC") moves for final summary judgment on Plaintiff Issam Azziz's ("Azziz") Complaint in its entirety.

**I. PRELIMINARY STATEMENT**

**A.    Introduction**

In his Complaint, Azziz contends that his employment was terminated "because he is a Muslim and a person of Arab and African ethnic characteristics, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981" (Count I). He also contends that: (1) he was fired in retaliation for activity purportedly protected by Section 1981 (Count II); and (2) that PwC interfered with his efforts to obtain subsequent employment, in violation of Section 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a) ("Title VII") (Count III). However, the undisputed record evidence conclusively establishes that PwC did not discriminate or retaliate against Azziz in violation of Section 1981 or Title VII.

Azziz has not asserted religion or national origin discrimination claims under Title VII because those claims are time-barred.  He also has not asserted retaliation claims under Title VII with respect to his employment with PwC or the termination thereof because those claims also are time-barred.

**B.**     **Summary Judgment Standard**

Under Rule 56, summary judgment is appropriate if the record evidence "show[s] that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c).  Once the moving party shows, by reference to record evidence, that there are no genuine issues of material fact, the non-moving party must then go beyond the pleadings, and by its own affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing there is a genuine issue for trial.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

## II. ARGUMENT

**A.**     **Azziz's Discrimination Claim Is Meritless**

**1.**     **Azziz's Discrimination Claims Are Not Cognizable Under Section 1981**

In his Complaint, Azziz has alleged that PwC discriminated against him "because he is a Muslim and a person of Arab and African ethnic characteristics" by subjecting him to "unequal" terms and conditions of employment and by terminating his employment on July 1, 2009.

Azziz's religious discrimination claims (e.g., "because he is a Muslim") have no basis in law because they are not cognizable under Section 1981.  *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987) (Section 1981 does not cover discrimination based on religion).

Moreover, to the extent Azziz is alleging discrimination based on the place of his origin ("African"), such claims constitute national or place origin discrimination claims, which also are not legally cognizable. *Al–Khazraji*, 481 U.S. at 613 (Section 1981 does not cover discrimination based on "the place or nation of his origin"); *Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006) ("By its very terms, § 1981 applies to claims of discrimination based on race, not national origin").  Although Azziz couches this claim in terms of "ethnic characteristics," in actuality this is an impermissible place of origin claim. Africa contains many different ethnicities; there is not a general "African" ethnicity.[1] Moreover, to the extent the term "African ethnicity" is utilized, it generally is used to refer to sub-Saharan ethnicities, as opposed to north African Arab ethnicities.  *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 296 (S.D.N.Y. 2003). Regardless, there is no evidence that anyone considered Azziz to be "African."

Accordingly, Azziz's claims of discrimination based on religion (Islam) and place of origin (Africa) must be dismissed.

### 2.      Azziz Cannot Establish A *Prima Facie* Discrimination Claim

To establish a *prima facie* case of disparate treatment discrimination, the plaintiff must show: (1) that he belongs to a protected class; (2) that he suffered an adverse employment action; (3) that he and a similarly situated non-protected person were dissimilarly treated; and (4) that the employment action was causally related to the protected

---

[1]   Ethnic groups in Africa number in the hundreds, each generally having its own language (or dialect of a language) and culture.  *See* ROBERT W. JULY, A HISTORY OF THE AFRICAN PEOPLE, 25-29 (3d ed. 1980).

status.  *See Oliver v. National Beef Packing Co., LLC*, 294 Fed. App'x 455, 457 (11th Cir. 2008); *Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

<blockquote>
a.    No Causal Relationship Between Azziz's Arab Or African Ethnic Characteristics And The Termination Of His Employment
</blockquote>

As to Azziz's "ethnic characteristics" claims, even assuming "Arab" is a protected ethnic characteristic under Section 1981, there is no evidence that the decision makers knew that Azziz was Arab.  The deposition testimony does not suggest or allege that Azziz suffered any form of discrimination based upon being a member of an "Arab" ethnicity.   Indeed, Azziz's deposition testimony reflects that he is alleging discrimination based solely on religion (Islam), not on any race or ethnicity.  *See Joseph*, *v. Florida Quality Truss Indus.*, *Inc*., 2006 WL 3519095, at *3-4 (S.D. Fla. Dec. 6, 2006) (rejecting Section 1981 claim where "Joseph's deposition is rife with similar testimony in which he alleges that he was discriminated against based upon his Haitian national origin not his race or ethnicity").

Although Azziz frequently told coworkers that he was from Morocco, and that fact was well known from his date of hire through his three promotions, it is purely speculation to conclude from that information that the decision makers, including Market Assurance Leader Pat Barberich, or any of the Tampa Partners, thought that he was Arab, much less that they took that into consideration.  *Soliman v. City of Tampa*, 2008 WL 1931320, at *5 (M.D. Fla. May 2, 2008) ("Although the plaintiff's application stated that he went to high school in Cairo, Egypt, it is simply speculation to conclude from that information, and the plaintiff's name, that the various decision makers thought that the plaintiff was a Muslim and an Arab, much less that they took those matters into consideration").

Azziz concedes that not all Moroccans are Arab; in fact, historically Moroccans were primarily of Berber ethnicity, with Berbers still constituting a significant portion of the population. [Azziz: 62].[2]  Geographically, Morocco is situated on the northern West African coast, which is not historically an Arab region.  Moreover, Azziz concedes that Morocco is a diverse society that "conceived various forms of beliefs, from paganism, Judaism, and Christianity to Islam."  [Azziz: 312-13 & Ex. 35].  There is no evidence that anyone at PwC considered Azziz to be Arab or even Muslim, and given Morocco's diverse culture, demographics and geographic location it is unreasonable to conclude that anyone would assume Azziz was Arab simply because he was from Morocco.  [Azziz: 61-62; Mustain: 35-36].

Furthermore, Azziz asserts that "a critical comment" contained in the original draft of his Diversity At Your Desk ("DAYD") article was the sole cause that led to his termination, and that he did not experience any discrimination or retaliation prior, or unrelated, to his participation in the DAYD article. [Azziz: 287-290; 298-299; 302-03].  The only sentence in any version of the DAYD article that could be interpreted as remotely critical is Azziz's reference in his original February 19, 2009 submission to Mark Ruise regarding "a Muslim candidate who [Azziz had referred to Human Resources and] who was highly qualified, but she was not being considered during a time when we needed staff."  [*Id.*].  [Ruise: Ex. 1; Azziz: Ex. 34].  This original February 19, 2009 DAYD text, which was never provided to any decision makers, refers only to the religion of the candidate, and does not suggest in any

---

[2]  See *Morocco*, WORLD FACTBOOK, Central Intelligence Agency, available at <https://www.cia.gov/library /publications/the-world-factbook/geos/mo.html>; ENCYCLOPEDIA BRITTANICA, *Berber* (2012), available at <http://www.britannica.com/EBchecked/topic /61465/Berber>.

way that the applicant was Arab.  Thus, based on Azziz's own testimony it is impossible to conclude that, as a result of this DAYD article, Azziz was discriminated against because of any "Arab" ethnic characteristics.

> **b.**    **Azziz Cannot Show That He And A Similarly Situated Non-Protected Person Were Dissimilarly Treated**

Azziz's employment was terminated predominantly because of the series of complaints by female subordinates accusing Azziz of inappropriate, and sometimes abusive, behavior toward female employees, consistently dismal upward feedback from subordinates over a period of three years, and general criticism by subordinates and supervisors of his management style.  The undisputed evidence is that no other Managers and Senior Managers in Florida have been dismissed for similar reasons by the relevant decision makers for at least the past five years, and there is no evidence of any such dismissals for similar reasons prior to that time period. [Mustain: 54-55].  Therefore, Azziz cannot demonstrate that any similarly situated employees were treated dissimilarly.  Moreover, no other Managers and Senior Managers engaged in conduct even remotely as offensive and abusive as Azziz.  Therefore, no comparators exist.

Although Azziz points to two employees – Morgan Uptergrove and a female Manager[3] – as non-minority employees who allegedly were not terminated, these employees are not valid comparators.  "In order to meet the comparability requirement[,] [Azziz] is required to show that he is similarly-situated in all relevant aspects to the non-minority employee."  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).

---

[3]   Azziz testified that these are his only two comparators.  [Azziz: 302].

Uptergrove was not similarly-situated to Azziz. Unlike Azziz, Uptergrove was not subject to numerous complaints by female employees that he engaged in repeated sexually inappropriate conduct and was abusive to female employees. Rather, Azziz contends that Uptergrove, an Assurance Manager, had a romantic relationship with an Associate on an engagement. However, unlike Azziz's sexually inappropriate conduct and abuse of multiple female subordinates, this was a consensual relationship and the individuals ultimately married. [Barberich: 46-48]. When the relationship came to management's attention, the two individuals were separated, and the Associate was placed on another engagement, consistent with PWC policy. [*Id.*]. Unlike Azziz's situation, which was a disciplinary issue involving Azziz's sexually inappropriate and abusive conduct toward female subordinates, Uptergrove's situation was a personal issue that was resolved to the parties' satisfaction. [*Id.*; Beattie: 70].

The female Manager also was not similarly-situated to Azziz. She was a high-level performing Manager – not a Senior Manager like Azziz – who consistently received "1" annual performance ratings, the highest rating possible, and had no disciplinary issues with respect to her treatment of other employees on her engagements. [Beattie: 74]. *See MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (Azziz must be "matched with a person or persons who have very similar job-related characteristics and who are in a similar situation" to the charging party). Rather, Azziz heard rumors, but has no personal knowledge, that the female Manager may have engaged in misconduct of a type completely different from that for which Azziz was terminated. [Azziz: 302]. Even if this conduct had occurred, it is not comparable to Azziz directing sexually inappropriate and

abusive conduct toward female subordinates in the workplace.  However, there is no admissible record evidence that such conduct ever occurred, and neither the Partners nor Human Resources was ever made aware of the existence of the conduct.  [Barberich: 43-45; Mustain: 95].  *See Oliver*, 294 Fed. App'x at 458 n.3 (employee is not a valid comparator where management was not aware of the purported comparator's misconduct).  The witnesses who discussed this rumor all admitted that they had no personal knowledge that the conduct ever occurred.  [Gargagliano: 81-82; Beattie: 69].

A plaintiff cannot establish a *prima facie* case based on rumors, hearsay and conclusory allegations.  *Joseph*, 2006 WL 3519095, at *7 ("Beyond his own conclusory deposition testimony, Joseph did not present any other evidence to substantiate his claims that non-Haitian employees received paid vacations.  Specifically, Joseph did not present this Court with wage records showing that non-Haitian employees received paid vacations or sworn testimony from Sadat, Murat, Ben or any of the other employees who Joseph claims received paid vacations.  Thus, it appears that Joseph is attempting to establish a *prima facie* case of discrimination by relying upon his own conclusory allegations.  However, this is insufficient to defeat a motion for summary judgment").  *See* Rule 56(c)(2), Fed.R.Civ.P.

Because Azziz cannot show that he and any similarly situated non-protected person were dissimilarly treated, he fails to establish a *prima facie* case.

### 3. PwC's Reasons For Terminating Azziz's Employment Were Legitimate And Non-Discriminatory

Azziz's employment was terminated for legitimate, non-discriminatory reasons.  Specifically, Azziz's employment was terminated predominantly because of the series of complaints by female subordinates accusing him of inappropriate sexual, and sometimes

abusive, behavior toward female employees, consistently dismal upward feedback from subordinates over a three-year period, and general criticism by subordinates and supervisors of his management style.[4]   As a managerial employee, Azziz engaged in repeated sexually inappropriate conduct toward female employees, in violation of firm policy, and made female employees feel uncomfortable on his engagements due to his inappropriate behavior.

### 4.   Azziz Cannot Prove That PwC's Legitimate, Non-Discriminatory Reasons Were A Pretext For Unlawful Discrimination

There is a complete absence of evidence that PwC's reasons for terminating Azziz were a pretext for unlawful discrimination or retaliation.  To establish pretext, a plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000).  A plaintiff's subjective belief that he has been the victim of discrimination or retaliation is insufficient to establish pretext. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1083 (11th Cir. 1990) (noting if an employee alleges discrimination in a conclusory way, but offers nothing more than a bare allegation, summary judgment is appropriate).

Additionally, mere speculation and conjecture cannot serve as a basis for establishing pretext. *See Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989) ("A plaintiff's subjective opinion that defendant's action was discriminatory, without supportive evidence, is not sufficient to establish pretext to avoid summary judgment").  Rather, a plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies,

---

[4] While Plaintiff's inability or unwillingness to improve his seriously deficient interpersonal skills was the predominant reason for his termination, his performance was below what was expected for a Senior Manager as discussed in his 2009 annual review process.  [Barberich: 9-10; Azziz: 150-55].

incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030.

Here, Azziz has presented no evidence that PwC's reasons for terminating his employment were a mere pretext for unlawful discrimination. It is undisputed that female employees were uncomfortable working with Azziz because of his inappropriate, sexually focused and abusive behavior toward them and that several female employees complained to Human Resources about his inappropriate conduct. Indeed, Azziz arguably created a sexually hostile work environment for at least one female employee, Ruth Astifidis, giving rise to potential liability exposure for the firm under federal and state anti-discrimination laws if prompt and appropriate remedial action had not been taken against Azziz.

It is further undisputed that Azziz received the worst Upward Feedback results that Barberich had ever seen. Employees provided extremely negative and critical feedback about Azziz, such as "Issam talks down to team members," that his behavior "is not professional," and that his conduct "creates a hostile work environment." Additional comments included: "Issam makes false promises to his staff"; "He does not take a genuine interest in people…"; his inability to "control his anger…contribute[s] to a hostile work environment"; "I'm not sure how to provide Issam constructive feedback because caring about people is not something that can be taught; it has to come from within"; "Issam makes me feel as though PwC is nothing but false promises"; "Issam makes staff feel completely

unappreciated"; "Issam needs to show greater respect for the members of his teams"; and "his behavior … is not reflective of a PwC professional."  Azziz's Upward Feedback was so poor that Barberich, the Florida Assurance Leader, had never seen Upward Feedback results so poor.

Azziz may argue that he was treated unfairly because his termination was effective immediately and he was not given the opportunity to remain employed while searching for new employment, as he claims two other employees were.  However, in reality, Azziz's termination was not immediate, because he previously received warnings and counseling and regarding his conduct and poor upward feedback and failed to correct his behavior. [Gargagliano: 74; Mustain: 81]. Moreover, Azziz was an at-will employee, was provided severance,[5] and Barberich decided against an extended counseling out period because Azziz's behavior issues were severe and he felt that keeping Azziz in the workplace after being notified of his termination would likely have had a negative impact on the office. [Barberich: 34; Mustain: 87; 152-53; Azziz: Ex. 3].

Azziz may point to one other Senior Manager, Chris Kard, who had been permitted to work through his notice period after being notified of his termination, but Kard is not a valid comparator because he was dismissed for performance issues, unlike Azziz's disciplinary issues, and Kard's continued presence would not create a negative employee reaction. [Barberich: 39; Mustain: 27-29].  Azziz has also pointed to another employee, Mike Beattie, whose termination was not made effective immediately. Yet, Beattie was a Portfolio Manager who held a completely different position than Azziz and whose termination was

---

[5] Azziz's Employment Contract provides that PwC, reserves the right to provide severance in lieu of any applicable notice period.  [Azziz: Ex. 3].

performance-based, not disciplinary. [Mustain: 137].   Thus, Beattie also is not a valid comparator.

Moreover, Azziz's allegations of discrimination simply make no sense.   Azziz frequently discussed with employees and Partners that he was Moroccan, and the Partners were aware of this when they decided to promote him to both the Senior Associate, Manager and Senior Manager positions.   The Partners who decided to promote Azziz were the same Partners involved in the decision to terminate his employment less than one year later.   *See Williams v. Vitro Services Corp*., 144 F.3d 1438, 1442 (11th Cir. 1998) ("where the facts indicate that the same individual both hired and fired an employee, an inference may arise that the employers' stated justification for terminating the employee is not pretextual"); *Robinson v. Alutiiq-Mele, LLC*, 2008 WL 1836370, at *7 (S.D. Fla. Apr. 23, 2008) ("Where as here, the same individual who hired or promoted the plaintiff is the one who fires or demotes him, there is an inference that the decision was not motivated by discriminatory animus").

Furthermore, Azziz never made any complaint while employed by PwC about discrimination or retaliation, and admits that he never experienced any disparaging comments about any protected status while at PwC. [Azziz: 296-300].

It is even more unlikely that PwC, a firm that goes to great lengths to promote a firm-wide culture of diversity and inclusion, would suddenly develop discriminatory animus and take discriminatory action against Azziz when no such animus or actions existed previously, simply because he voluntarily agreed to participate in the firm's diversity DAYD initiative. DAYD articles were designed to help employees learn about the various cultures existing

within PwC's Florida market by presenting interviews with PwC employees about their cultures, as well as a brief synopsis of PwC's presence in the employee's country of origin. Employee participation in a DAYD article is entirely voluntary.

Moreover, there is no evidence that any of the Partners concluded from Azziz's participation in the DAYD initiative that he possessed Arab or African ethnic characteristics. Indeed, the DAYD version Azziz sent to the Partners on February 23, 2009 contained no references to religion or ethnic characteristics at all.  Even the February 19, 2009 answers Azziz sent to Ruise, which were never provided to any Partners or Human Resources, did not make any reference to Arab or African ethnic characteristics.  Not only are such allegations of discrimination illogical, they are completely unsubstantiated and entirely false.

**B.**      **Azziz's Retaliation Claims Are Meritless**

   **1.**      **Azziz Cannot Establish A *Prima Facie* Retaliation Claim**

To establish a *prima facie* case of retaliation, a plaintiff must show "that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal connection between [the two events]."  *Jackson v. B&L Disposal, Inc.*, 425 Fed. App'x 819, 820 (11th Cir. 2011); *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).[6]  If a plaintiff makes out a *prima facie* case of retaliation, the burden then shifts to the defendant to articulate legitimate, non-retaliatory reasons for the adverse employment action. *Shannon*, 292 F.3d at 715.  "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual."  *Id*. (citations omitted).

---

[6]   Retaliation cases arising under § 1981, and under Title VII follow the same analytical framework. *See, e.g., Summers v. City of Dothan*, 444 Fed. App'x 346, 351 (11th Cir. 2011).

a.       <u>**Azziz Did Not Engage In Statutorily Protected Activity**</u>

Azziz cannot establish a *prima facie* retaliation case because he did not engage in statutorily protected activity of any kind.  The only activity that he alleges was protected was contained in the initial draft of his DAYD article dated February 19, 2009.  His assertion of protected activity fails for two reasons.  First, the February 19, 2009 version of the DAYD article never reached a decision maker.  In fact, it only reached Mark Ruise, a Manager who occupied a lower level position than did Azziz.  Ruise had no influence over, or control over, Azziz's employment, and his only function regarding the article was to edit and publish it once it had been finalized.  He retained final editorial discretion over the content of the diversity of the DAYD article, according to both his testimony [Ruise: 24:5-30:11], and Melanie Gillman, his counterpart in Miami.  This scenario is reminiscent of the philosophical question, "If the tree falls in the forest, but there is no one present to hear it, does it make a sound?"  In this case, even if one would assume that the content of the February 19 draft constituted protected Section 704(a) expression, if it was never communicated to a person with decision making authority over Azziz's employment it could not possibly be protected expression.

Second, neither the February 19 initial version of the article, nor the February 23 edited version which was presented for the first time to Partners by Azziz, constituted protected expression.   "[M]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient [to constitute protected activity under Section 704(a) of the Act]."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *see also*

*Offutt v. Warren County Reg'l Jail*, 109 Fed. Appx. 740, 743 (6th Cir. 2004) (finding no protected activity under Title VII where employee "never indicated that her opposition was based on Title VII"); *Cavazos v. Springer*, 2008 U.S. Dist. LEXIS 58317, at *25-26 (S.D. Tex. Aug. 1, 2008) ("in order for an employee's complaint to a supervisor to constitute protected activity necessary to establish a *prima facie* case of retaliation under the opposition clause, . . . the complaint must concern, and be in opposition to, conduct made unlawful by Title VII"); *Mikols v. Reed City Power Line Supply Co*., 2008 WL 2696915, at *6 (W.D. Mich. July 1, 2008) (finding no protected activity where employee's general comments about "treating people equitably" did not "inform the employer that gender discrimination" was employee's concern).

Here, Azziz never complained – even in general terms – about unlawful discrimination.  The draft of Azziz's DAYD article which was sent to Partners on February 23 was not critical of, and in fact was almost entirely complimentary of, PwC's diversity efforts.  Indeed, it made absolutely no reference to discrimination at all.  Rather, it simply offered general suggestions on how to continue to improve diversity, in general. In fact, Azziz acknowledged that the "Tampa office has taken positive steps to address diversity" and that "leadership knows the value of diversity."  Azziz did not refer to religion at all, except for a single statement in his article that Morocco "conceived many forms of beliefs, from paganism, Judaism, Christianity to Islam."  In short, Azziz's comments fall far short of suggesting that any discrimination was occurring, and certainly did not constitute an objection to any religious, race or national origin discrimination.

Accordingly, Azziz's February 23 DAYD article which he sent to Tampa Partners, does not constitute or incorporate protected activity under Title VII or Section 1981.[7]

### b.    Azziz Cannot Establish Causation

Azziz has not elicited any evidence reflecting a causal connection between his DAYD article and his termination, or his inability to obtain subsequent employment, and thus he fails to establish a *prima facie* case of retaliation.  *See Matthews v. Wisconsin Energy Corp. Inc*., 534 F. 3d 547, 559 (7th Cir. 2008); *Szymanski v. County of Cook*, 468 F. 3d 1027, 1029

---

[7]   Even the February 19 version of the article, which was never seen by a decision maker who could have affected Azziz's career, was insufficient to qualify as protected expression.  To engage in protected activity, a plaintiff must reasonably believe that the underlying conduct was severe enough to violate Title VII or Section 1981.  *Howard v. Walgreen*, 605 F.3d 1239, 1244 (11th Cir. 2010); *Weeks v. Harden Mfg. Corp*., 291 F.3d 1307, 1311–12 (11th Cir. 2002) (a plaintiff "must show that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." (internal marks omitted)); *Little v. United Tech., Carrier Transicold Div*., 103 F.3d 956, 960 (11th Cir. 1997) (plaintiff's belief about allegedly unlawful employment practices must be "objectively reasonable in light of the facts and record presented").

Accordingly, a plaintiff must demonstrate both that he subjectively believed that the employer was engaged in unlawful employment practices and that his belief was objectively reasonable in light of the facts and record presented.  *Little*, 103 F.3d at 960 (holding employee's belief that a racially derogatory remark by a co-employee constituted unlawful discrimination under Title VII was not reasonable and thus his complaint concerning the comment was not protected activity); *Standard v. ABEL Sevs., Inc*., 161 F.3d 1318, 1328–29 (11th Cir. 1998) ("[T]o satisfy the first element of the *prima facie* case [of retaliation], it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute.").  If the employee's belief is not both objectively reasonable and in good faith, the complaint does not constitute protected activity.  *Little*, 103 F.3d at 960; *Standard*, 161 F.3d at 1329.  "A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented."  *Butler v. Alabama Dep't of Transp*., 536 F.3d 1209, 1213 (11th Cir. 2008).

Applying this test, the brief reference to a Muslin candidate for this position could not, as a matter of law, qualify as a good faith, reasonable belief that PwC was engaged in unlawful employment practices, nor could it even have been construed as a complaint.

"Courts have consistently rejected retaliation claims where the underlying conduct is legally insufficient to show that the plaintiff's belief was objectively reasonable."  *Uppal v. Hospital Corp. of Am.*, 2011 WL 2631869, at *5 (M.D. Fla. July 05, 2011).  *See also Scribner v. Collier County*, 2011 WL 2746813, at *5 (M.D. Fla. July 14, 2011) ("existing substantive law shows that Scribner's belief that Flagg's behavior constituted a hostile work environment was not objectively reasonable.  Thus, his retaliation claim fails as a matter of law.").

(7th Cir. 2006) ("Given that there is no admissible evidence to show that [the former employer] ever talked to anyone at the [prospective employer], . . . it is impossible to conclude that her failure to be hired had anything at all to do with retaliation on the part of [the former employer]").

Under controlling Eleventh Circuit precedent, the greater than four-month temporal gap between Azziz's alleged protected activity and his termination are insufficiently proximate, as a matter of law, to establish causation.  Although causation may sometimes be established by showing close temporal proximity between the protected conduct and the resulting adverse employment action, "mere temporal proximity, without more, must be 'very close.'"  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Breeden*, 532 U.S. at 273).  The Eleventh Circuit has held that a three month disparity between the statutorily protected expression and the adverse employment action is insufficient, as a matter of law, the establish causation.  *Id.  See also Drago v. Jenne*, 453 F. 3d 1301, 1308 (11th Cir. 2006) (three-month temporal gap is not "sufficiently proximate to show causation); *Summers v. City of Dothan*, 444 Fed. App'x 346, 351 (11th Cir. 2011) ("three to four month" temporal gap insufficient to show causation); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) ("three and one-half month temporal proximity is insufficient to create a jury issue on causation").

Here, Azziz sent his DAYD article to the Partners on February 23, 2009.  His employment was not terminated until July 1, 2009 – more than four months later.  Likewise, he received his 2009 annual performance rating of "4" or "less than expected," following his Annual Review Committee ("ARC") meeting, on June 26, 2009 – more than four months

after he sent his DAYD article to the Partners.  *See Clark County Sch. Dis. v. Breeden*, 532 U.S. 268 (2001) (temporal proximity must be "very close"); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action").

Moreover, despite extensive discovery, there is absolutely no evidence that PwC ever provided any negative reference to any of Azziz's prospective employers.  In fact, all of the testimony is to the contrary, that PwC Partners actually provided no negative information regarding Azziz. Azziz's primary post-employment retaliation claim is that PwC provided negative information to his immediately subsequent employer, KRMT.  However, the record evidence demonstrates that PwC never provided negative information regarding Azziz to KRMT – or any other prospective employer.  Bill Tapp, the managing partner of KRMT testified that PwC partners provided absolutely no negative references.  Moreover, Azziz himself has admitted that he immediately acquired employment with KRMT as a Senior Manager, demonstrating an absence of adverse action.  Furthermore, Tapp testified that Azziz was dismissed from KRMT in November, 2009 due to his own inability or unwillingness to do the work as assigned, and for misconduct, not as a result of any negative references. [Tapp: 32:6-36:17]

The other purported negative reference was allegedly made to Blue Cross and Blue Shield of Florida, Inc. ("BCBS") in November 2010 – twenty-one months after Azziz's alleged protected activity.  Yet, BCBS's Director of Finance and Operations, Kim Read, testified that PwC did not provide any information about Azziz to BCBS, and Azziz has no

evidence to the contrary.  In addition, Read testified that Azziz was dismissed from BCBS due to his own inability or unwillingness to do the work assigned, and not as a result of any negative references from PwC or anyone else.  [Read Affidavit, ¶¶ 9-12].

Azziz is unable to establish, through temporal proximity, a causal connection between his DAYD article and any purported unfavorable reference.  Not only was there a significant hiatus between Azziz's DAYD article and his termination, but also there was even greater temporal separation between the article and the alleged negative references to Azziz's prospective employers.  For example, Azziz alleges that a negative reference was provided to KRMT in September 2009 – seven months after his DAYD article.  The other purported negative reference was allegedly made to BCBS in November 2010 – twenty-one months after Azziz's alleged protected activity.  Moreover, Azziz has been able to obtain other jobs in the accounting field since leaving PwC, including with MetLife.  There is no evidence demonstrating that anyone from PwC ever communicated any negative information about Azziz to MetLife, or to any of Azziz's prospective employers, and Azziz admits that he has no evidence to the contrary.  Thus, in this area of proof, Azziz is left with nothing but unsubstantiated speculation.

Under controlling precedent, these large hiatuses give rise to a strong inference that no retaliation occurred.  Therefore, Azziz cannot establish a *prima facie* case of retaliation.

### 2.      Defendant's Reasons For Terminating Azziz Were Legitimate And Non-Retaliatory

Azziz's employment was terminated for legitimate, non-retaliatory reasons. Specifically, Azziz's employment was terminated predominantly because of the series of complaints by female subordinates accusing Azziz of inappropriate, and sometimes abusive,

behavior toward them, dismal upward feedback over a three-year period and the general criticism by subordinates and supervisors of his management style.[8]

### 3.      Azziz Cannot Prove That Defendant's Legitimate, Non-Discriminatory Reasons Were A Pretext For Unlawful Retaliation

There is simply no evidence that Defendant's reasons for terminating Azziz were a pretext for unlawful retaliation.  To establish pretext, a plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action."  *Chapman*, 229 F.3d at 1025.  A plaintiff's subjective belief that he has been the victim of retaliation is insufficient to establish pretext.  *See Earley*, 907 F.2d at 1083 (noting if an employee alleges discrimination in a conclusory way, but offers nothing more than a bare allegation, summary judgment is appropriate).

Azziz cannot show that the reasons for his termination were pretextual because his inappropriate and abusive behavior toward female employees, his dismal Upward Feedback over a three-year period and the general criticism by subordinates and supervisors of his management style – the predominant reasons for the termination of his employment – all preceded Azziz's alleged protected activity (his DAYD article), and were discussed with him on several occasions prior to his DAYD article.  For example, Azziz received negative Upward Feedback results in 2007 and 2008, when he was a Manager.  In 2008, the Partners debated promoting Azziz to Senior Manager, but "had a tough conversation about whether we would promote him to Senior Manager because of (the poor Upward Feedback results)."

---

[8]  While Plaintiff's inability or unwillingness to improve his seriously deficient interpersonal skills was the predominant reason for his termination, his performance was below what was expected for a senior manager. [Barberich: 9-10; Azziz: 150-55].

Ultimately, the decision was made to promote Azziz in September 2008, but on the condition that he be put on notice that his negative Upward Feedback was a serious issue that needed to be improved.

Moreover, the record evidence shows that Azziz's inappropriate and harassing conduct toward female subordinates pre-dated his DAYD article. Azziz started making sexually inappropriate comments and engaging in other offensive and inappropriate conduct toward Ruth Astifidis starting in late 2008, prior to his DAYD article.  Likewise, in November or December of 2008, Azziz made his inappropriate comment to the entire engagement team that female PwC Manager, Michelle Schaeffer, could not take part in a conference call because she was "breastfeeding."  Another incident, where Azziz approached Schaeffer in her office and began inappropriately yelling at her when she asked a question about an engagement, occurred in early 2009, prior to the DAYD article.  Similarly, the incident during which Azziz became abusive to Denise Reguerin at the client's facility, and in the vicinity of both client and PwC employees, slammed down his computer, began screaming loudly at Reguerin in an offensive and insulting manner, punched a wall and stormed out of the room, occurred on February 5, 2009, prior to the DAYD article.  These incidents were brought to the attention of Human Resources prior to Azziz's DAYD article, which he provided to the Partners for the first time on February 23, 2009.

Although Azziz's termination did not occur until July 1, 2009, each of the reasons for the termination was addressed with Azziz on several occasions prior to the February 23, 2009 DAYD article.  Thus, Azziz cannot credibly argue that these reasons were somehow manufactured after the alleged February 23, 2009 protected activity as a pretext to conceal a

retaliatory motive.  For example, Melissa Mustain and Partners Jeff Gilbert and John Sittig met with Azziz on February 13, 2009 – ten days prior to Azziz's DAYD article – to discuss Azziz's inappropriate conduct and the complaints from female employees.  A plaintiff cannot establish a causal link between his termination and protected activity where his own misconduct and his superior's dissatisfaction with his performance pre-dated his protected activity.  *See Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001).  *See also Summers*, 444 Fed. App'x at 351 ("when an employer contemplates taking a materially adverse action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation"); *Fadael v. Palm Beach County Sch. Dist.*, 2008 WL 4500700, at *5 (S.D. Fla. Oct. 2, 2008) (granting summary judgment where "the acts of which Plaintiff complains as retaliatory occurred prior to the [alleged protected activity").

Furthermore, PwC's annual performance evaluation process utilizes an Annual Review Committee ("ARC"), whereby the employees' performance is evaluated by a committee, which recommends a final annual performance rating. The ARC process is independent, meaning that the Partner who reviews an employee's file generally is not the same Partner who supervised that employee during the year.  Because the ARC reviewer has not worked with the reviewee on engagements, the employee's Upward Feedback, PFFs and other Performance Notes received throughout the year from their engagement Partners and Human Resources are included in the ARC file and each constitutes a component in determining the employee's final ARC performance rating.   The file reviewer may also discuss the reviewee's performance with Partners who are present during the review.  Azziz's

ARC review meeting was held in June 2009, and Kyle Maryanski, a Partner from a separate office who had not supervised Azziz during the year, was the file reviewer. Based upon Maryanski's independent review along with concomitant input from the Partners, on June 26, 2009 Azziz received a "4" rating or "less than expected," which is the lowest overall rating possible.

Azziz may argue that pretext is established because he believes PwC's perception of his workplace behavior and interpersonal problems were incorrect. However, in attempting to demonstrate pretext, Azziz may not "recast [Defendants'] proffered nondiscriminatory reasons or substitute his business judgment for that of [Defendants]." *Chapman*, 229 F.3d at 1030. If the proffered reason "might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id*. Here, there is no question that Defendant's stated reasons would motivate a reasonable employer to take the same actions. Indeed, given the severity and pervasiveness of Azziz's inappropriate conduct toward female subordinates, a failure to take disciplinary action may have given rise to liability exposure under federal and state anti-discrimination laws. "The reasonableness of [Defendant's] disciplinary action is not an issue so long as the action was not discriminatory." *Diggs,* 2008 U.S. Dist. LEXIS 47559, at *15.

We are aware that Azziz disagrees that his misconduct was inappropriate, offensive to, and unwelcome by female employees, and we anticipate that he will seize upon this disagreement in an effort to create the appearance of an existence of a disputed issue of material fact. However, this argument misses the mark because the pertinent issue is not

whether he disagrees that he engaged in the inappropriate conduct, whether the female employees were correct in being offended or uncomfortable with his conduct or whether they should have complained.  Rather, the pertinent issue is that female employees, on multiple occasions, in fact did complain about Azziz's conduct and that he was counseled multiple times on his behavior.

Finally, Azziz's allegations of retaliation simply make no sense.  PwC promotes diversity initiatives and strategies designed to attract, develop, and advance the most talented individuals regardless of their race, national origin, sexual orientation, religion, age, gender, or any other dimension of diversity.  Indeed, the "Diversity at Your Desk" article was initiated by one of the firm's own Minority "Circles," a group designed to help ethnic minorities connect with one another and provide mentoring, learning and development opportunities.  It is illogical to conclude that an employer that places such importance on diversity, and proactively seeks ways to educate its employees on the benefits of diversity and inclusion, would turn around and retaliate against an employee – not only during his employment but also for more than a year later by actively preventing him from getting a new job – simply because the employee made a single innocuous comment about diversity in response to a request by the Minority Circle for feedback on diversity.

### III. CONCLUSION

For the foregoing reasons, PwC requests that the Court enter final summary judgment in its favor and against Azziz on Azziz's Complaint in its entirety.

Respectfully submitted,

/s/ Peter W. Zinober
Peter W. Zinober
Florida Bar No. 121750
Email:  zinoberp@gtlaw.com
Jay P. Lechner
Florida Bar No. 0504351
Email:  lechnerj@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 East Twiggs Street, Suite 100
Tampa, Florida  33602
Telephone:  (813) 318-5700
Facsimile:   (813) 318-5900
Attorneys for Defendants

## CERTIFICATE OF SERVICE

**I  HEREBY  CERTIFY** that  on  September  28,  2012  I  electronically  filed  the

foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice

of electronic filing to:

Peter F. Helwig, Esq.
Kathryn S. Piscitelli, Esq.
Harris & Helwig, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, Florida  33813

/s/ Peter W. Zinober
Attorney